## GRISCOM–RUSSELL CO. v. WESTING-HOUSE ELECTRIC & MFG. CO.

### No. I.

District Court, E. D. Pennsylvania.
March 16, 1940.

Pennie, Davis, Marvin & Edmonds and W. Brown Morton, all of New York City, and William Steell Jackson & Son, of Philadelphia, Pa., for plaintiff.

Drury W. Cooper, Sr., Drury W. Cooper, Jr., and Victor Beam, all of New York City, A. B. Reavis, of Lester, Pa., and Harvey Lechner, of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a suit for infringement of letters patent No. 1,955,015, issued to Price, for a heat exchange apparatus—more specifically a stationary head for a heater for feed-water in high-pressure boiler installations. In the conventional low-pressure heater of the older art, the head consists of a cylindrical chamber divided longitudinally by a partition into separate inlet and outlet compartments. The water to be heated comes, under pressure, into the inlet compartment, passes out of it into a U-shaped tube or series of tubes in one end (the tube sheet), passes through the heating medium (steam extracted from the turbines which drive the dynamos) and returns in the tubes to the outlet compartment, from which it goes to the boiler.

The outer end of the head consists of a heavy plate (cover plate) bolted on.

In low-pressure installations this simple apparatus is adequate. However, it has been long recognized that greater efficiency can be obtained by operating at higher pressures. As increased pressures came to be used in large power plants, the apparatus had to be made heavier, and more and bigger staybolts had to be used to secure the cover plate until, when pressures of about 1,600 pounds were reached, the old style head became really inadequate. No matter how numerous or heavy the stay-bolts, there was always danger that the cover plate would be pushed out by the pressure of the water so that it would leak around the edges.

An obvious expedient to meet this condition was the "man-hole" type of cover plate, that is, one which seats from within against an internal flange forming a part of the stationary head, being held in place by the pressure of the fluid. Of course, it had to be removable, in order to get at the inside of the head for cleaning or repairs, and (although not in the claim in suit) it could be made of eliptical shape so that it could be turned edgewise and passed through the aperture.

The difficulty, however, with the man-hole cover plate was that something had to be done about the partition which divided the head into inlet and outlet compartments. It could no longer be bolted to the cover plate, particularly if the other end was integral with the tube plate, as it had to be, nor could it be allowed to extend clear across the compartment to the cover plate. That was possible with the old type of outside cover plate which was removed by simply unbolting and taking off, but obviously impossible with any type of cover plate which had to be pushed into the head to be removed or installed. Even with the old type, there was difficulty because the tremendous pressures in the more recent systems loosened the joint between the cover plate and the partition and caused leakage from the inlet compartment into the outlet compartment, which, however small, greatly reduced the efficiency of the whole device.

The problem was concretely presented to the patentee about as stated. He was an engineer in the employ of the plaintiff company. A customer sent the plaintiff a drawing for a heater having pressure scated man-hole covers and asked for bids. In the drawing, the problem was met by using two separate man-hole covers, one for the inlet chamber and one for the outlet chamber, with a partition structure integral with the head. The plaintiff wished to use one man-hole cover instead of two, and the patentee undertook to redesign the head and in so doing produced the structure of the patent.

He shortened the partition so that it extended, not entirely across the head to the cover plate but, say, three-quarters of the way. Then he bolted a plate or auxiliary partition to it at right angles. The plaintiff describes it as "a partition structure which was entirely independent of the cover plate and which allowed sufficient space within the compartment for the manipulation of the oval cover plate to bring it into registry with its opening." It was undoubtedly a satisfactory solution of the leakage problem in feed-water heaters for high-pressure boilers. The combination of the man-hole type of cover plate and the right angle partition independent of and spaced away from it within the head, both closures being kept sealed by pressure, was also novel, as a combination.

However, none of the elements were new. The man-hole cover, concededly, was very old. The idea of the "independent" partition, maintained in place by the difference in pressure between the incoming and outflowing water, did not originate with the patentee. It formed the principal feature of the British Patent 267,255 of 1927, and might have been taken bodily from that disclosure with only the slightest and most obvious modification to make it available with a man-hole cover plate.

In determining whether or not the patentee's design was an invention, we must assume that when he received the Milwaukee blue prints calling for a high-pressure head with a man-hole cover and sat down to redesign the structure he had the British patent before him. This being so, I am unable to find invention in the adoption of it as the other element of the combination. It seems very plain that if you have a cover plate which has to be pushed into the head in order to be removed or inserted you cannot have a partition extending from end to end of the head but must have one spaced away from it. That idea, at least, can be grasped without the exercise of invention. And the British pat-

ent supplies a type of partition which leaves plenty of space for manipulation of the cover plate within the head. There was certainly ingenuity, if not real invention, in utilizing the difference in pressure in the inlet and outlet chambers to seat and seal a partition entirely independent of the cover plate and within the head, but that was not the patentee's conception but someone's else. The patentee's contribution to the art consisted in introducing it into a head structure which required a cover plate of the man-hole type. At this point, if anywhere, invention is to be looked for, but I do not think that it is to be found.

It is quite true that the design of the British patent is not exactly that of the patent in suit. For one thing, it is a multiple-pass heater—a matter which makes no difference at all. Also the horizontal wall of each partition extends to a point where the end is flush with the end of the outside walls of the head—possible in the British patent, but not possible in the man-hole type. In the British patent, spacing the partition away from the cover plate is accomplished by using an outwardly convex cover plate maintained by bolts. Of course, if the cover plate is inwardly convex there will be no spacing unless the partition is shortened, and the farther into the head it extends, the farther away the end of the partition must be withdrawn. This modification seems to be a simple mechanical adaption.

Invention has often been found in combinations of elements all of which are old. As combinations, they may be novel. However, the question always remains whether introducing an element (old or new) into an old combination to adapt it to a newly developed need is invention, and this question must be determined upon the same general principles which determine invention in any case. If its selection is fairly obvious, or within the potentialities of the reasonably skilled worker in the art, invention is lacking.

My conclusion is that the patent in suit is invalid for want of invention.

While not strictly necessary, it may be well, in order to provide for a possible appeal, to state that I am also of the opinion that if the patent were valid, the defendant's structure would infringe claim 1, which is the only one in suit.

If the parties desire, they may submit requests for findings of fact and conclusions of law in accordance with the foregoing opinion. If not, the statements of fact and law in the opinion may be taken as special findings and conclusions.